John L. Flynn, J.
The petitioner, a local council, has been merged into a larger local council. It has brought this application for an order (Civ. Prae. Act, art. 78) setting aside the determination of the respondent to refuse to renew its local council charter and directing the respondent to renew it. The respondent cross-moves for an order pursuant to sections 1288 and 1294 of the Civil Practice Act striking out of the petition paragraphs 16 and 30 to 38 inclusive; pursuant to sections 1293 to 1296 dismissing the petition in accordance with the objections in point of law set forth in the answer; pursuant to sections 1295 and 1296 dismissing the petition on the ground that on the face thereof dismissal is warranted as a matter of law; and pursuant to sections 1295 and 1296 of the Civil Practice Act and rule 113 of the Buies of Civil Practice dismissing the petition on the ground that there is no genuine issue of fact for trial, and that respondent is entitled to judgment dismissing petition.
The respondent started as a national organization in 1915 when it was incorporated in the District of Columbia and it is now organized as a corporation chartered by special act of Congress. The Congressional charter was granted March 16, 1950. There are presently approximately 2,750,000 girl members and approximately 750,000 adult members, making a total membership of approximately 3,500,000. The growth of the organization is evidenced by the fact that it had 50,000 members in 1920. The need for reorganization was recognized as early as 1946, when there began the formulation of the council coverage plan. In the decade 1950 to 1960 the membership increased by a number well in excess of 1,750,000.
The Congressional charter confers on the national council the “ power to make and amend a constitution and by-laws, and to elect a board of directors, and officers and agents ”. The respondent’s constitution provides: “ The National Council at its meetings shall determine the general lines of policy of the Girl Scout movement and program * * * and (give) guidance to the Board upon general lines of direction of the *783 movement and program. * * * The affairs of the corporation between meetings of the National Council shall be managed by a board of directors ’ ’. The board consists of 70 directors and 7 ex officio members.
A Girl Scout Council is a unit accredited, licensed or chartered by the respondent, granting to the unit the license to use the Girl Scout program and the words Girl Scout and the Girl Scout insignia. The unit is charged with responsibility to develop, manage and maintain Girl Scouting within a defined geographic jurisdiction. The charters are issued triennially for a specified period and are granted, withheld or revoked by the national board of directors. Presently there are 816 chartered councils and their functions fall into 17 stated categories. It has been the position of the respondent, born out of necessity, that the individual troops cannot themselves provide the services nor can they be provided by direct contact between each troop and the national organization. Thus the councils were organized to bridge the gap. Thus field organizations were set up on a neighborhood plan offering a decentralized form of operation in which specific responsibilities are delegated to geographic units called “ Neighborhoods ”. The geographic neighborhood is a subdivision of a council and is its primary service unit. The council coverage plan was adopted when local councils were 1,609 in number with 6,794 lone troops without council supervision, and an estimated 12,000 communities in which no Girl Scouting existed and nearly half of all the girls in the country lived in rural areas where • few troops were available. Thus it is contended that it became evident that an orderly program of internal reorganization and realignment was indispensable. The merger of existing councils and lone troops into larger units was considered the method to be preferred over a solution by increasing the national budget staff and services to serve the then existing councils and lone troops which varied in size, kind and in need of services.
Prior to the national meeting held in 1957, the board of directors had resolved “ That discussion of the Council Coverage Plan, its progress, its difficulties, its accomplishments, and its future be provided for at the next meeting of the National Council.” At the national meeting held in 1957, affirmative action was taken in ratification of the program of council coverage. It was stated at that time that the goal of the council coverage plan was “ 800 contiguous councils” instead of the then existing 1,265. Prior to each meeting of the national council, a “ Workbook ” is prepared and in the 1957 “ Workbook ” it was noted:
*784 “ From the experience of 169 council development committees, which have during the past six years transformed 288 councils and 1496 lone troop towns into 169 new councils, a set of standards were evolved for council organization. * * *
‘ ‘ In spite of the progress already made, the achievement of the ultimate goal of serving girls only through strong councils will require some change in jurisdiction for nearly half of all presently chartered councils. Among these councils are some that would prefer to remain unchanged. If acceded to, such a preference, while understandable, would make full achievement of the coverage program impossible.”
At the 1957 national council meeting the following proposed resolution was defeated: ‘ ‘ That further area council extension be confined to jurisdictions where there is a reorganized and expressed desire upon the part of those concerned and that participation in such councils need not be mandatory.”
The resolution which did pass was as follows: “be it resolved that the affirmation of the purpose for which we are organized, we in National Council assembled do hereby instruct the Board of Directors to continue work on the plan of nationwide council coverage provided that in all instances local council knowledge and experience shall be used in effecting workable combinations of jurisdiction, and provided further that any council refusing to participate in an enlarged or changed jurisdiction which had been agreed to by a majority of other councils or communities concerned, shall have the right of a hearing by the Board of Directors before any final action is taken.”
In the annual report in 1959 made to Congress it was stated that during the year a total of 109 councils merged and 1,033 lone troops theretofore without council assistance were brought under council jurisdiction. The report further stated: “ This progress in coverage may be considered a gratifying outcome of the organization’s efforts — in the sense of extending and improving service to girls. Bigness for bigness sake is not part of the objective, but experience is showing that the larger councils have the resources and the necessary support of the jurisdiction to offer a total program of quality.”
At the 1960 national convention the following resolution was adopted: “ be it resolved for the affirmation of the purpose for which we are organized, we in National Council assembled do hereby instruct the Board of Directors to continue work on the plan of nationwide council coverage provided that in all instances local council knowledge and experience shall be used in effecting workable combinations of jurisdiction, and provided further that any council refusing to participate in an enlarged or *785 changed jurisdiction which had been agreed to by a majority of other councils or communities concerned, shall have the right of a hearing by the Board of Directors before any final action is taken,” which was supplemented by the following statement:
“ and further, when a council is not needed in a proposed enlarged or changed jurisdiction, its charter shall not be revoked nor its issuance withheld solely because of its non-participation in the proposed jurisdiction, if it otherwise meets the Criteria for an Effective Council and all charter requirements.
“ That the National Council requests the National Board to determine and clarify more definitely all procedures governing local council participation in the plan of nationwide council coverage and to make these procedures available to all local councils.”
Thereafter, the national board of directors had established the end of 1963 as the time when the council coverage is to be completed. Among the procedures adopted for that purpose (1961 Blue Book) is the following: “ Any council refusing to participate in an enlarged or changed jurisdiction which has been agreed to by a majority of other councils or communities concerned, shall have the right of a hearing by the national Board of Directors before any final action is taken.”
Between the meetings of the national board the affairs of the organization are managed by the executive committee. Unification of the geographical jurisdiction of the petitioner council into the jurisdiction of the Council of Girl Scouts of Allegheny County, Pennsylvania, was duly processed and, thereafter, adopted by the national board of directors and the national executive committeee. In that enlarged council jurisdiction were 9 other councils and 20 lone troop communities. All participated therein save the petitioner. The number of adult members involved was 9,399 and the number of girls enrolled in the councils and lone troops which consented was 34,640, while the petitioner is composed of 90 adult members and 484 enrolled girls, 1.1% of the total number of girls and adults involved. This reorganization was adopted by the executive committee. The respondent’s constitution provides: £ £ The Board of Directors, in its sole discretion, shall have the power to issue these credentials subject to the requirements established by the National Council, and to revoke them when, in its opinion, the terms and conditions thereof or requirements therefor are being violated or when the best interests of Girl Scouting are not being furthered.” By letters of April 12, April 26, May 4 and June 6,1962, petitioner protested the action of realignment and consolidation and requested a hearing and did so pursuant to the required pro *786 cednre that: ‘ ‘ Any council refusing to participate in an enlarged or changed jurisdiction which has been agreed to by a majority of other councils or communities concerned shall have the rights of a hearing by the National Board of Directors before any final action is taken.”
The request for a hearing was granted. The national board of directors held meetings in the period May 23 through May 25, 1962, when it was not feasible to have the necessary material completed in time for that meeting. Petitioner expressly requested in its June 6, 1962 letter that it be allowed “ a hearing at the September meeting of the Executive Committee of the National Council. * * # Therefore, we are herein respectfully requesting that we be included on the agenda for the September meeting of the Executive Committee.”
The national board of directors, at its May meeting, had resolved: ‘ ‘ Due to the emergent existing situation the Board of Directors empowered the Executive Committee if requested by the Donora Girl Scout Council to conduct the hearing and resolve the issues presented therein before the next regular meeting of the National Board of Directors and further empowers the Executive Committee to take such actions on the Application for a Change of Council Jurisdiction for Girl Scouts of Allegheny County, Pennsylvania, as are directed in the decision made on such hearing.”
Petitioner was again advised by the chairman of the national executive committee of its right to be heard and was requested to assemble certain materials and offered the assistance of national volunteers and staff in the preparation of a presentation. Petitioner did forward the requested material and acknowledged the offer of aid by the national volunteers and staff. At the hearing held on September 29, 1962 there was the following colloquy: “ Mrs. Wertz (Petitioner’s President): We feel that right here, we have had this opportunity. President Culmen: You feel you have had full opportunity? Mrs. Wertz: Yes. President Culmer: Good.” Action was taken at that meeting in accordance with the action of the national board-directing the committee to act and the proposal under review was unanimously adopted. At the next meeting of the national board held in October, 1962, the action of the executive committee was ratified and approved.
In its brief the petitioner suggests some issues which have emerged requiring trial. It is charged that the hearing was sham and prejudiced. It is urged, in support thereof, that representatives of the respondent had stated that the hearing was a mem formality and that petitioner had been informed at a meet *787 ing with the president of the respondent that no council, including the petitioner, would be permitted to avoid the board’s merger policy. While these statements are vehemently denied, the issue is not whether they were made, but whether the petitioner was fully and properly advised and guided with respect to proceeding and whether the issue received full and proper hearing before the executive committee. The statements made at the hearing by the petitioner’s president must be deemed to be a complete refutation of the contention. Petitioner suggests further that a legal issue exists in that the executive committee was without power to conduct the hearing on a question of charter renewal. It has already been made manifest, however, that the affairs of the respondent are managed between meetings of the national council by the national board and between meetings of the national board by the executive committee, that the duties of the national board are performed between its meetings by the executive committee, that the national board had placed upon the executive committee the duty to process the matter in issue, Avhich it did, and thereupon, its determination was ratified and affirmed by the national board, and the meeting of the executive committee, at which the matter was heard, was requested for that purpose by the president of the petitioner. It may be noted that at the meeting of the executive committee 22 members were present, which constituted all of its members, save 4. The adoption was by unanimous vote of those present. At the subject meeting of the national board, of a total membership of 71, only 6 were absent. In view of these facts, and of the further fact that this was by a stipulation in the effectuation of the over-all national policy, to which no objection has been raised, to direct a further hearing or the taking of any other action Avould be futile. But in all the circumstances no defect, technical or otherwise, appears. (Fox v. Adams, 206 Misc. 236.)
The question remains whether the respondent is entitled to all the relief as requested in its cross notice of motion. The paragraphs of the petition to Avhich objection is raised pursuant to subdirdsion 1 of the cross notice, are not improper or prejudicial, and that branch of the cross application is denied.
The relief sought pursuant to subdivisions 2 and 3 is also denied since the petition is dismissed for lack of merit rather than for insufficiency. The relief sought pursuant to subdivision 4 is granted.
Accordingly, the main motion is denied and the cross motion is denied, save with respect to subdivision 4 thereof as to which it is granted, and the petition is dismissed.